IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| YOSVANNIS VALLE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-3867 |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Petitioner Yosvannis Valle's Petition for Writ of Habeas Corpus (Document No. 1) and Respondent Nathaniel Quarterman's Motion for Summary Judgment (Document No. 11). After having carefully considered the Petition, the Summary Judgment Motion, and the arguments and authorities submitted by counsel, the Court is of the opinion that Respondent's Motion for Summary Judgment should be GRANTED, and Valle's Petition for Writ of Habeas Corpus should be DENIED.

## I.   Background

Petitioner Valle was convicted of capital murder for murdering Jose "Yogi" Junco during the course of a robbery. Junco was a drug dealer. Amy Lindgren was his live-in girlfriend.

On the night of June 7, 1999, Lindgren was watching television in the home she shared with Junco. She heard dogs barking outside.

When she looked out the window, Lindgren saw several men standing outside the house.   Thinking the men were there to buy drugs, Lindgren called Junco. Junco went outside.

A short time later, Junco came back into the house with his hands raised and a gun pointed at his back.  He told Lindgren not to look at the men, and someone covered Lindgren's face with a pillow.  She heard men yelling in the next room, asking Junco where he kept money and drugs.   Lindgren then heard eight or nine gunshots.  She remained on the floor until she heard the men run out of the house and heard their car pull away.  Lindgren then ran into the other room to check on her baby and found Junco's bullet-riddled body.  She called 911.

Lindgren later viewed a photo lineup and identified Kenneth Estrada as one of the men who participated in the shooting.   She was unable to identify anyone in a live lineup.  14 Tr. at 24-38.[1] Police later arrested Estrada and recovered two spent .22 caliber bullet casings from his truck.  Id. at 126-29.

Jose Arenazas testified, pursuant to an agreement with the Harris County District Attorney's office, that he participated in the Junco murder.  He testified that Valle was the leader of a group of five or six men, including Arenazas and Estrada.  Several days earlier, Estrada had backed down from a confrontation.  The group decided to have Estrada steal Junco's drugs and money to

---

[1] "Tr." refers to the transcript of Valle's trial.

prove to Valle that Estrada "still had it."  They met at Valle's apartment, which he and his girlfriend shared with Estrada and Estrada's girlfriend, Anna Sanchez.  Arenazas had a .357 Magnum, and he also saw a .22 caliber and a chrome plated .9 mm handgun that belonged to Valle.  Valle assigned each of the men a job to perform in the robbery.  Valle, Estrada, and one other member of the group carried guns.

The men arrived at Junco's house and Arenazas, the driver, honked the horn of their car.  When Junco came out, Estrada, who knew Junco, went to the gate and told him he wanted to buy cocaine. Estrada pulled a gun on Junco, and the rest of the group, except Arenazas, followed Junco back into the house.  Arenazas remained in the car.  A few minutes later, one of the group came out of the house carrying two rifles.  He gave the rifles to Arenazas and returned to the house.  A few minutes after that, Arenazas heard gunshots from inside the house and saw the men flee the house.

The men took about $150 worth of cocaine and $100 in cash from Junco's house.  As the men drove away from Junco's house, Valle stated that he killed someone for a quarter ounce.  The men returned to Valle's apartment.  Christina Guerra and Anna Sanchez were there.

Valle entered the apartment, removed his clothes, threw them in the bathtub, and burned them.  He also urinated on his hands, explaining that this would mask any gunpowder on his hands.  As the

3

men discussed the shooting, Valle said that he unloaded his whole clip during the shooting.  Id. at 180-209.

Anna Sanchez testified that the men had gathered at Valle's apartment before the murder and talked about going to Yogi's house to "kick door."  They left at about 10:00.  When they returned about 45 minutes later, they were acting nervous.  Sanchez saw the men with photos of Yogi and his girlfriend, cash, a pager, guns, and drugs.  She overheard the men say that they shot Yogi multiple times.  Valle threatened to kill Sanchez if she ever told anybody what she heard.  Id. at 247-64.

Robert Dolan was a friend of Arenazas from a prior stint in prison.  He met Valle through Arenazas.  He described Valle as the leader of the group that included Arenazas and Estrada.  Valle admitted to Dolan that he shot Junco.  15 Tr. at 47-56.

Dr. Paul Shrode of the Harris County Medical Examiner's office performed an autopsy on Junco.  He identified multiple gunshot wounds to Junco's body and recovered multiple projectiles, including a .22 caliber bullet, from Junco's body.  Junco died of multiple--Dr. Shrode estimated eleven--gunshot wounds.  14 Tr. at 153-74.

Based on this evidence, the jury found Valle guilty of capital murder for intentionally causing Junco's death while in the course of committing or attempting to commit robbery.  14 Tr. at 7; 15 Tr. at 124.

4

During the penalty phase, the State presented evidence that Valle previously served time in prison.  There was also evidence to link Valle to the murders of Raymond Duenas, Carlos Escamilla, and Gregory Garcia.  The State demonstrated that Valle is a sergeant in a prison gang called LaRaza Unida, that he killed Duenas as part of a power struggle within the gang, and that he ordered a gang associate to kill Duenas's wife, although there is no evidence that she was ever killed.  He ordered his subordinate to kill Escamilla, also a gang member, for "making a move" on Valle's girlfriend.  He killed Garcia because Garcia "disrespected" another gang member. 16 Tr. at 12-17 Tr. at 247.  The State also presented evidence that Valle had a shank, or homemade knife, in his cell during his pretrial detention.  17 Tr. at 249-52.

Valle presented testimony by Dr. Richard Cervantes, a clinical psychologist.  Dr. Cervantes reviewed interviews with Valle and materials about Valle's background.   He concluded that Valle was exposed to severe family risk factors as a child, including his mother having had multiple sex partners, witnessing his mother having sex, and suffering physical abuse to himself and his mother. Dr. Cervantes noted in particular evidence that as a child Valle was forced to kneel on sharp objects and was subjected to beatings. Valle also grew up in extreme poverty in Cuba and probably suffered from poor nutrition, which can affect brain chemistry thereby causing problems with learning and attention.  Valle also suffered severe anxiety attacks.

Valle's father emigrated to the United States in the Mariel boat lift when Valle was about five years old.  Valle was raised by his mother, with various male partners in the household.  Dr. Cervantes testified that his background information indicated that Valle was very close to his father before he left and began having behavior problems afterward.

Valle came to the United States when he was 14 or 15 years old, but had problems with his stepmother.  He began associating with gangs, using drugs, and engaging in other delinquent behaviors.  Dr. Cervantes concluded, based on his review of Valle's background and records from Valle's time in the custody of the Texas Youth Commission, that Valle responds well and can control his behavior when given structure and clear direction.  18 Tr. at 7-32.

Edurna Imana, a French citizen, is Dr. Cervantes's research assistant.  At Dr. Cervantes's request, Imana went to Cuba to locate and interview Valle's relatives.  She spoke to Valle's grandmothers, an aunt, an uncle, and Valle's mother and sister. Valle offered a videotaped interview with his relatives in Cuba, but the trial court ruled that Valle could play the tape only without sound because the relatives' statements were inadmissible hearsay.  Valle played the video portion of the tape, with Imana explaining to the jury what was depicted on the tape.  Id. at 48-68.

Gabriel Valle, Valle's brother, testified that their mother had suffered head trauma as an infant. She dropped out of school in fourth grade. She attempted suicide several times as a result of abuse from boyfriends or husbands. The Valle brothers on one occasion, when Petitioner was about eight years old, found their mother after one of her suicide attempts.

Gabriel also testified that his mother cheated on his father, which caused tension in the household until the father left for the United States. Some of the other men in their mother's life were abusive to the Valle brothers and their mother. One boyfriend, Angel Pineda, beat their mother savagely and threatened to kill her or the boys. He killed the boys' pet dog in front of them. <u>Id.</u> at 96-114.

The jury unanimously concluded that the evidence proved beyond a reasonable doubt that: (1) there is a probability that Valle would commit future criminal acts of violence constituting a continuing threat to society; and (2) Valle actually caused Junco's death, intended to kill Junco, or anticipated that a human life would be taken. The jury also unanimously found that mitigating evidence was insufficient to justify a life sentence. 19 Tr. at 35-37. Accordingly, the trial court sentenced Valle to death. <u>Id.</u> at 39.

The Texas Court of Criminal Appeals affirmed Valle's conviction and sentence, <u>Valle v. State</u>, 109 S.W.3d 500 (Tex.Crim.

App. 2003), and denied his application for a writ of habeas corpus, Ex Parte Valle, No. 63,068-01 (Tex.Crim.App. Dec. 7, 2005).  Valle filed this timely federal petition for a writ of habeas corpus on December 6, 2006, and Quarterman moved for summary judgment on May 17, 2007.

II.  <u>Discussion</u>

A.  <u>The Anti-Terrorism and Effective Death Penalty Act</u>

This federal petition for habeas corpus relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996.  *See* <u>Lindh v. Murphy</u>, 117 S. Ct. 2059, 2066-67 (1997).  Under the AEDPA, federal habeas corpus relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>Kitchens v. Johnson</u>, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable

application of, clearly established [Supreme Court precedent]."
See Martin v. Cain, 246 F.3d 471, 475 (5th Cir.), cert. denied, 122
S. Ct. 194 (2001). Under the "contrary to" clause, this Court may
afford habeas relief only if "'the state court arrives at a
conclusion opposite to that reached by . . . [the Supreme Court] on
a question of law or if the state court decides a case differently
than . . . [the Supreme Court] has on a set of materially
indistinguishable facts.'" Dowthitt v. Johnson, 230 F.3d 733, 740-
41 (5th Cir. 2000) (quoting Williams v. Taylor, 120 S. Ct. 1495,
1519 (2000)), cert. denied, 121 S. Ct. 1251 (2001).

The "unreasonable application" standard permits federal habeas
relief only if a state court decision "identifies the correct
governing legal rule from [the Supreme Court] cases but
unreasonably applies it to the facts of the particular state
prisoner's case" or "if the state court either unreasonably extends
a legal principle from [Supreme Court] precedent to a new context
where it should not apply or unreasonably refuses to extend that
principle to a new context where it should apply." Williams, 120
S. Ct. 1495 at 1520. "In applying this standard, we must decide
(1) what was the decision of the state courts with regard to the
questions before us and (2) whether there is any established
federal law, as explicated by the Supreme Court, with which the
state court decision conflicts." Hoover v. Johnson, 193 F.3d 366,
368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable

9

application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Neal v. Puckett, 239 F.3d 683, 696 (5th Cir. 2001), aff'd, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom.* Neal v. Epps, 123 S. Ct. 963 (2003). The solitary inquiry for a federal court under the "unreasonable application" prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" Id. (quoting Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997)); *see also,* Gardner v. Johnson, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas corpus relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2); Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 2001 (2001). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Jackson v. Anderson,

112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1059 (1998).

B.   The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." Clark v. Johnson, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 121 S. Ct. 84 (2000).  Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases.  *See* Rule 11 of the Rules Governing Section 2254 Cases.  In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the non-moving party.  Anderson v. Liberty Lobby, 106 S. Ct. 2505, 2513 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").  However, where a state prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor.  Marshall v. Lonberger, 103 S. Ct. 843, 849-50 (1983); Sumner v. Mata, 101 S. Ct. 764, 769 (1981); May v. Collins,

955 F.2d 299, 310 (5th Cir. 1991), *cert. denied*, 112 S. Ct. 1925 (1992); Emery v. Johnson, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), aff'd, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 418 (1998). Consequently, where facts have been determined by the Texas state courts, this Court is bound by such findings unless Valle shows that an exception to 28 U.S.C. § 2254 applies.

C.   Summary Judgment in the Instant Case

Valle's petition raises 14 claims for relief. These are addressed in turn.

1.   Inability to Call Cuban Mitigation Witnesses

In his first five claims for relief, Petitioner contends that he was denied his Sixth, Eighth, and Fourteenth Amendment rights because he was unable to call potential mitigation witnesses residing in Cuba. He acknowledges that these witnesses were beyond the subpoena power of the trial court. His core argument is that it was "constitutionally unjust" to seek the death penalty against Petitioner because travel restrictions to and from Cuba prevented him from calling some mitigation witnesses who had known him when he was a child.

a.   Ineffective Assistance of Counsel

In Claim One, Valle contends that he was denied his Sixth Amendment right to effective assistance of counsel because the

12

State sought the death penalty when he could not present testimony by the Cuban mitigation witnesses.

To prevail on a claim for ineffective assistance of counsel, Petitioner "must show that . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." <u>Strickland v. Washington</u>, 104 S. Ct. 2052, 2064 (1984). Valle points to nothing that counsel could or should have done differently to obtain testimony from the Cuban witnesses. Therefore, he fails to establish that counsel rendered deficient performance, and is not entitled to relief on Claim One.

> b.   <u>Due Process, Equal Protection, Cruel and Unusual Punishment</u>

In Claims Two and Three, Valle argues that the Texas death penalty statute violated his Fourteenth Amendment right to due process of law and his Eighth Amendment right to be free from cruel and unusual punishment by allowing the State to seek the death penalty when he was unable to call mitigation witnesses from Cuba. In Claims Four and Five, Valle argues that the trial court violated his Fourteenth Amendment rights to due process and equal protection by denying his pretrial motion to prevent the State from seeking the death penalty due to the unavailability of the Cuban mitigation witnesses.

Valle relies on <u>Lockett v. Ohio</u>, 98 S. Ct. 2954 (1978) (plurality opinion) for the proposition that a capital defendant

may not be precluded from presenting any relevant mitigating evidence during the penalty phase of his trial. He cites Washington v. Texas, 87 S. Ct. 1920 (1967) and several cases in its progeny for the general proposition that a criminal defendant has a Sixth Amendment right to present a complete defense.

The two general principles cited by Valle are well-established and uncontroversial. In these claims, however, Valle does not argue that the trial court prevented him from presenting relevant evidence. Rather, he claims that his rights were violated because he wanted to present witnesses who were beyond the subpoena power of the trial court and who were, due to the state of diplomatic relations between Cuba and the United States, unable to travel to Texas to testify.

Petitioner cites no case holding that the United States Constitution prohibits the death penalty when potential mitigation witnesses the defendant desires to call are unavailable. In practical effect, Valle's situation is no different than one who desires the testimony of witnesses who are deceased or who are unwilling to testify and who are beyond the subpoena power of the court. Clearly, one would have no constitutional claim under those circumstances. "[C]onvictions are not unconstitutional under the Sixth Amendment even though the United States courts lack power to subpoena witnesses (other than American citizens) from foreign countries." United States v. Zabaneh, 837 F.2d 1249, 1259-60 (5th

14

Cir. 1988).   Likewise, the unavailability of Valle's potential
witnesses did not render unconstitutional Texas's efforts to impose
the death penalty.

Moreover, Petitioner offers no argument that he was treated
any differently than any other defendant based on his membership in
a protected class.  He therefore fails to state a claim for relief
under the equal protection clause.  *See*, *e.g.*, <u>Washington v. Davis</u>,
96 S. Ct. 2040 (1976); <u>Sheeran v. Schoepner</u>, 198 F.3d 241 (5th Cir.
1999) (both holding that an equal protection claim requires proof
of discrimination based on membership in a protected class).
Accordingly, Petitioner is not entitled to relief on Claims Two
through Five.

2.   <u>Exclusion of Audio Portion of Videotape</u>

During Edurna Imana's testimony, the defense played a
videotaped interview Imana conducted with Valle's mother in Cuba.
The trial court did not allow Petitioner to play the audio portion
of the tape or provide the jury with a transcript of the interview
because, the Court held, the statements by Valle's mother were
inadmissible hearsay.  Petitioner was allowed to present to the
jury the video portion, however, which Imana narrated.  She
testified, for example, where the videotape was made so that the
jury could see the conditions of poverty in which Valle grew up in
Cuba, and identified various of Petitioner's relatives who could be

15

seen on the video, including his mother, both grandmothers, and his sister.  In Claims Six and Seven, Valle argues that the trial court's decision to exclude the audio denied him due process.

Petitioner acknowledges that his mother's out-of-court statements were hearsay.  He argues, however, that they were admissible under Texas law as a statement of personal or family history, Tex.R.Evid. 804(b)(3), or as the basis for Dr. Cervantes's expert opinion.  He further argues, citing <u>Chambers v. Mississippi</u>, 93 S. Ct. 1038 (1973) and <u>Green v. Georgia</u>, 99 S. Ct. 2150, 2151-52 (1979), that his constitutional interest in presenting a full case in mitigation of punishment was sufficiently strong to require the trial court to allow the testimony even if it was hearsay for which there was no recognized exception.

a.  <u>Statement of Personal or Family History</u>

Rule 804(b)(3) of the Texas Rules of Evidence creates an exception to the hearsay rule for statements of personal or family history, defined as:

> (A) A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history even though declarant had no means of acquiring personal knowledge of the matter stated; or
>
> (B) A statement concerning the foregoing matters, and death also, of another person, if the declarant was related to the other by

16

> blood, adoption, or marriage, or was so
> intimately associated with the other's family
> as to be likely to have accurate information
> concerning the matter declared.

Petitioner claims that his mother's videotaped statements would have both bolstered his brother's testimony, the truthfulness of which was questioned by the prosecutor in closing argument, and "added to the information he provided to fully explain Petitioner's childhood experiences." Pet. at 23-24. Valle does not specifically identify what additional childhood experiences his mother would have expanded upon but, presumably, he refers to additional testimony about the privations and abuse he suffered as a child. Such information, as the Texas Court of Criminal Appeals correctly held, is not included within the hearsay exception of Rule 804(b)(3), which only permits statements about the fact of a close relative's birth, adoption, marriage, death, and other specific items listed in the statute. In contrast, the Court of Criminal Appeals reported that Petitioner's mother proposed to testify about her own medical problems, Petitioner's difficulties in the Texas Youth Commission, Petitioner's desire to leave Cuba, and the abuse inflicted upon Petitioner by his stepfather, none of which falls within the Rule 804(b)(3) exception. *See* <u>Valle v. State</u>, 109 S.W.3d 500, 505 (Tex. Crim.App. 2003).

    b.   <u>Basis of Expert Testimony</u>

Rule 705(d) of the Texas Rules of Evidence provides:

> When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial.

The Texas Court of Criminal Appeals observed that Dr. Cervantes testified that he relied on the videotaped interview with Petitioner's mother and stated some of the facts from the interview that he relied on for his expert opinion.  The Court of Criminal Appeals concluded, however, that allowing direct presentation of the mother's interview to the jury would have entailed a danger that the jury would consider the videotaped hearsay statements as substantive evidence rather than merely information upon which the expert relied in reaching his opinion.  <u>Valle</u>, 109 S.W.3d at 505-06.  Valle therefore received the benefit of his mother's statements as a basis for Dr. Cervantes's opinion testimony, and the Court of Criminal Appeals found no abuse of discretion in the trial court's application of Rule 705 and its holding to exclude the hearsay audio portion of the videotape. Valle fails to demonstrate that the Texas Court of Criminal Appeals's interpretation of this Texas rule was wrong.

18

     c.   Competing Interests

Finally, relying on Chambers v. Mississippi, 93 S. Ct. 1038 (1973) and Green v. Georgia, 99 S. Ct. 2150, 2151-52 (1979), Valle argues that due process required admission of this hearsay notwithstanding the Texas rules of evidence because his interest in presenting a full mitigation case outweighs the State's interest in enforcing its rules of evidence.  Petitioner proposes a new constitutional interpretation far beyond the holdings of these cases.

In Chambers, the trial court barred the defendant from offering testimony by three persons who each would have testified to hearing statements made by another suspect, on three separate occasions after the murder, that he (the other suspect) was himself the murderer.  Each of those persons if called as a witness would have been subjected to cross examination and, as well, the third party suspect could be called.  The Supreme Court held that exclusion of this evidence as hearsay denied Defendant Chambers due process.  The Court stated:

> Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E.g.*, Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948).  In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and

> innocence.   Although   perhaps   no   rule   of
> evidence has been more respected or more
> frequently applied in jury trials than that
> applicable   to   the   exclusion   of   hearsay,
> exceptions tailored to allow the introduction
> of evidence which in fact is likely to be
> trustworthy have long existed.   The testimony
> rejected   by   the   trial   court   here   bore
> persuasive assurances of trustworthiness and
> thus   was   well   within   the   basic   rationale
> of   the   exception   for   declarations   against
> interest.   That testimony also was critical to
> Chambers' defense.   In these circumstances,
> where constitutional rights directly affecting
> the ascertainment of guilt are implicated,
> the   hearsay   rule   may   not   be   applied
> mechanistically to defeat the ends of justice.

<u>Chambers</u>, 93 S. Ct. at 1049.   The Court carefully analyzed the considerable assurances of reliability for admission of this hearsay.   First, each of the other suspect's confessions was made spontaneously to a close acquaintance shortly after the murder occurred.   Second, each confession was corroborated by some other evidence in the case, which the Court detailed.   And third, each confession was self-incriminating and "unquestionably against interest."   <u>Id.</u> at 1048.

In <u>Green</u>, Green's co-defendant, Moore, admitted to a friend that he himself killed the victim.[2]   The trial court excluded the testimony of Moore's confession as inadmissible hearsay under Georgia law.   Regardless, held the Court, the exclusion was a

---

[2] Neither Mississippi nor Georgia recognized a hearsay exception for statements against penal interest.   *See* <u>Green</u>, 99 S. Ct. at 2151, n. 3; <u>Chambers</u>, 93 S. Ct. at 1048, n. 20.

denial of due process under "these unique circumstances."  <u>Green</u>,
99 S. Ct. at 2151.  The Supreme Court held:

> Moore made his statement spontaneously to a
> close friend. The evidence corroborating the
> confession was ample, and indeed sufficient to
> procure a conviction of Moore and a capital
> sentence. The statement was against interest,
> and there was no reason to believe that Moore
> had any ulterior motive in making it. Perhaps
> most important, the State considered the
> testimony sufficiently reliable to use it
> against Moore, and to base a sentence of death
> upon it.

<u>Id.</u>

The strong indicia of reliability surrounding the excluded
testimony in both <u>Chambers</u> and <u>Green</u> stands in sharp contrast to
the testimony at issue in this case.  Valle's mother, unlike the
declarants in both <u>Chambers</u> and <u>Green</u>, did not make statements that
exposed her to criminal liability.  She had obvious non-self-
incriminating motivations to exaggerate or fabricate in order to
convince a jury to spare her son's life.  Her statements, unlike
the wrongfully excluded testimony in <u>Chambers</u>, would not be subject
to adversarial testing.  In sum, the videotaped statements by
Valle's mother contain no compelling indicia of reliability and in
any event are not so momentous or consequential to Valle's
mitigation case as to take on constitutional proportions that
overcome their hearsay character.  The trial court did not violate
Petitioner's rights under <u>Chambers</u> and <u>Green</u> by excluding as

21

hearsay the audio portions of the videotape, and the Texas court's decision assuredly was not an unreasonable application of <u>Chambers</u> and <u>Green</u>.

In reviewing evidentiary rulings of a state court, a federal habeas court "do[es] not sit as a super state supreme court to review error under state law." <u>Skillern v. Estelle</u>, 720 F.2d 839, 852 (5th Cir. 1983), *cert. denied*, 105 S. Ct. 224 (1984). A federal court may grant habeas relief "only when the trial judge's error is so extreme that it constitutes a denial of fundamental fairness under the Due Process clause." <u>Bailey v. Procunier</u>, 744 F.2d 1166, 1168 (5th Cir. 1984). The Court of Criminal Appeals held, contrary to Valle's argument, that the audio portion of the tape did not fit within any exception to the hearsay rule. <u>Valle</u>, 109 S.W.3d at 505-06. The statement also lacked the indicia of reliability that could, under some circumstances, require admission of an otherwise inadmissible statement during the penalty phase of a capital trial. Accordingly, the trial court's ruling did not deny Petitioner a fundamentally fair trial, the Court of Criminal Appeals's conclusion that the trial court did not deny Petitioner due process was reasonable, and Petitioner is not entitled to relief on Claims Six and Seven.

3.   <u>Ineffective Assistance of Counsel</u>

In Claims Eight through Eleven, Valle argues that his trial counsel rendered ineffective assistance by failing to call several witnesses.  These witnesses include: Valle's father who, Valle states, would have corroborated testimony by Valle's brother about the difficulties of Valle's childhood (Claim Eight); Rebecca Rodriguez, Tino Rodriguez, Margarita Rodriguez, and Christina Guerra, who would have testified that they liked Valle and that he was capable of maintaining positive relationships with people (Claim Nine), and that Guerra never heard Valle order the murder of Raymond Duenas and that Valle was upset when he saw a television news report of Duenas's death (Claim Ten); and an expert psychological witness to testify that Valle suffers from post-traumatic stress disorder (Claim Eleven).

a.   <u>The Legal Standard for Ineffective Assistance of Counsel</u>

To prevail on a claim for ineffective assistance of counsel, Valle

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

23

Strickland v. Washington, 104 S. Ct. 2052, 2064 (1984).  In order to prevail on the first prong of the Strickland test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  Id.  Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances.  Id. at 2065.  Review of counsel's performance is highly deferential.  Id.

In the context of a capital sentencing hearing, "the question [whether the defendant suffered prejudice] is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Id. at 2069.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 2068.  As the Fifth Circuit succinctly framed the concept:  "Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that . . . death was not an appropriate sentence?"  Neal v. Puckett, 239 F.3d 683, 692 (5th Cir. 2001).

b.    Ineffective Assistance of Counsel in This Case

The Fifth Circuit has held that "complaints based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial

counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain." <u>Alexander v. McCotter</u>, 775 F.2d 595, 602 (5th Cir. 1985) (citing <u>United States v. Cockrell</u>, 720 F.2d 1423, 1427 (5th Cir. 1983), *cert. denied*, 104 S. Ct. 3534 (1984)).  Turning to the short list of uncalled witnesses here, however, there is substantial evidence that trial counsel's decisions not to call Valle's father, friends, and girlfriend, or to obtain a psychological evaluation, were strategic choices made after reasonable investigations that fell "within the wide range of reasonable professional assistance."  <u>Strickland</u>, 104 S. Ct. at 2065.

Valle's counsel did meet with Valle's father, found that the father was reluctant to become involved in the case, determined that the relationship between Valle and his father was strained, so much so that it was difficult even to get the father to provide clothes for Valle to wear for trial.  Significantly, Valle's father had immigrated to the United States when Valle was only five years old and hence, his father would have been unable to corroborate the testimony of Valle's brother regarding those formative years in Cuba when Valle was subjected to abuse after his father departed. Moreover, trial counsel found that if they called Valle's father to testify, he would have been vulnerable to cross-examination about Valle's long-running problems with authority and the law after Valle moved to the United States.

Petitioner asserts that Rebecca Rodriguez, Tino Rodriguez, and Margarita Rodriguez would have characterized Petitioner as likeable and that he liked Salsa music and played it all the time, and that he participated with the Rodriguez family in barbecuing, talking, dancing, and joking. There is no evidence that if these persons had been located that they would have testified, nor is there any proof of what their testimony actually would have been. Moreover, the ostensible testimony adds no apparent weight to Petitioner's mitigation case that was focused upon his poor and horrible upbringing rather than upon his depiction as a pleasant and sociable friend who, at least when not with the Rodriguez family, carried on as a ranking officer leading a violent gang.

Christina Guerra, Petitioner's girlfriend, regarded Petitioner as a good man evidenced by the fact that he never hit her, not even on one occasion when she had struck him. Her claimed ability to help absolve Valle of the murder of Duenas boiled down to her not having heard Petitioner order that murder to be committed and to her having observed him as appearing "very upset" when she and Petitioner saw a news clip on television reporting Duenas's murder. Defense counsels' affidavits indicated that they did attempt to find Christina Guerra, but were unsuccessful. If they had located her, however, counsel was uncertain that calling her as a witness would benefit Petitioner because she knew so much about Valle's drug dealing and perhaps his other gang activities. Moreover,

Duenas's murder was not the only murder attributable to Valle, and there is no evidence that Guerra had any proof to clear Valle of the other murders that he had ordered and/or committed.

Petitioner's post-trial psychologist, Dr. Paula Lundberg-Love, who he argues should have been presented at trial, offers an opinion based on her examination of Petitioner that Petitioner suffered from post-traumatic stress disorder and other psychological disorders that caused Petitioner to lash out at perceived threats.   Otherwise, her investigation of Valle's background largely corroborated the mitigation evidence that was offered at trial through psychologist Dr. Richard Cervantes and others about Valle's terrible childhood in Cuba.   Petitioner's trial counsel made a strategic decision not to seek a psychological examination in advance of trial because such likely would have subjected Valle to a state-sponsored psychological examination pursuant to Lagrone v. State, 942 S.W.2d 602 (Tex. Crim. App. 1997), which trial counsel feared would uncover damaging evidence regarding Valle's erratic and violent behavior.   Instead, they employed psychologist Dr. Cervantes to present the mitigation case based on his extensive study of Petitioner's background.

While Petitioner now argues that Dr. Cervantes was not sufficiently thorough, he does not argue that Dr. Cervantes is unqualified or that counsel acted unreasonably in relying on his expert opinion.

27

> Counsel should be permitted to rely upon
> the objectively reasonable evaluations and
> opinions of expert witnesses without worrying
> that a reviewing court will substitute its own
> judgment, with the inevitable hindsight that a
> bad outcome creates, and rule that his
> performance was substandard for doing so.

Smith v. Cockrell, 311 F.3d 661,676-77 (5th Cir. 2002), *overruled on other grds by* Tennard v. Dretke, 124 S. Ct. 2562 (2004).

Trial counsel are entitled to highly differential consideration, and it is evident from this record that trial counsel conducted appropriate investigations and developed a substantial mitigation case.  Petitioner concedes that trial counsel "offered testimony at punishment that described Valle's disastrous childhood, troubled adolescence, and the difficulty any teenager would face in adjusting from Castro's Cuba to residency in the U.S."  Dr. Cervantes sent his research assistant Edurna Imana to Cuba on her Mexican passport to interview many of Petitioner's family members and to videotape the impoverished places where Petitioner grew up.  The proof she gathered in Cuba became foundational for some of Dr. Cervantes's opinions and the videotape was also viewed along with Imana's narrative to demonstrate the destitute areas where Petitioner was reared through adolescence. Trial counsel for Petitioner also called Professor Virgil Suarez, a Cuban emigre, who related how difficult the transition is for a non-speaking Cuban to arrive and adjust in the United States.  He described in detail how he himself succeeded in becoming a

professor because "key people" had helped him to avoid the gangs. Petitioner's trial counsel also called Petitioner's brother, who described much of Petitioner's upbringing, and the cruel and adverse circumstances that they encountered as children and youth. In all of this, Petitioner's trial counsel provided a much more comprehensive and fulsome mitigation case than one might have suspected would be possible.

Even assuming, however, that not calling Petitioner's father and girlfriend, or not finding the Rodriguez family members who liked Petitioner, amounted in any measure to deficient performance, Petitioner has made no showing to demonstrate prejudice. After all, the State established that Valle was in a position of authority in a violent gang responsible for at least three murders (Junco, Escamilla, and Garcia), and that Petitioner was responsible for a fourth murder, Raymond Duenas. Thus, even if Christina Guerra had been located and had testified that she never heard Petitioner order the murder of Duenas and that Petitioner was very upset when Duenas's murder was reported on television news, and even had the Rodriguez family members recounted pleasant memories of barbeques and family times with Petitioner, and even if Petitioner's father could have added corroborating evidence of Petitioner's horrible childhood, there is "no reasonable probability that . . . the result of the proceeding would have been different." Strickland, 104 S. Ct. at 2068.

Moreover, Dr. Lundberg-Love's proposed testimony is, at best, double-edged.  Evidence that Valle's childhood traumas left him with psychological disorders might elicit some sympathy from the jury.  Evidence that his disorders cause him to lash out violently at perceived threats, however, may substantially strengthen the State's future dangerousness argument by demonstrating that Valle is unable, or has great difficulty, reining in his violent impulses.  Therefore, even if counsel had retained Dr. Lundberg-Love, it cannot be assumed that her testimony would have helped Valle's case.  The Supreme Court's conclusion in <u>Strickland v. Washington</u> applies here as well:

> Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.  Here there is a double failure. More generally, [Petitioner] has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance.  [Petitioner's] sentencing proceeding was not fundamentally unfair.

<u>Strickland</u>, 104 S. Ct. at 2071.  The state court's conclusion that Valle did not receive ineffective assistance of counsel is not an unreasonable application of <u>Strickland</u>, and Respondent is entitled to summary judgment on claims 8 through 11.

4.   <u>Appellate Review</u>

In Claims Twelve through Fourteen, Petitioner contends that defects in the Texas statutory death penalty scheme prevent meaningful appellate review of death sentences in violation of due process.  In Claim Twelve, he argues that the anti-parties charge given to the jury during the sentencing phase required no finding beyond that which had already been found in the guilt/innocence stage of the trial.  Valle argues that this prevents an individualized assessment of deathworthiness.  In Claim Thirteen, Valle argues that Texas law violates due process by permitting the State to admit victim impact evidence to rebut mitigation evidence. In Claim Fourteen, he argues that none of the special issues is amenable to meaningful appellate review, leading to the arbitrary imposition of the death penalty.

a.   <u>The Anti-Parties Charge</u>

During the guilt/innocence phase, the trial court instructed the jury that it could find Valle guilty of capital murder under the law of parties, which provides:

> A person is criminally responsible for an offense committed by the conduct of another if . . .

31

> (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs or attempts to aid the other person to commit the offense.

Tex. Penal Code §7.02(a)(2).  During the penalty phase, the court instructed the jury that it must determine

> whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

Tex. Code Crim. Pro. art. 37.071(2)(h)(2).  Valle argues that the special issue is redundant of the law of parties, *i.e.*, that the jury's finding that Valle was guilty of capital murder either because he actually killed Junco or promoted or assisted in the murder requires an affirmative answer to the special issue. Therefore, Valle argues, the special issue is not amenable to meaningful appellate review because the evidence to support an affirmative answer is necessarily sufficient if it is also sufficient to support a finding of guilt under the law of parties.

On direct appeal, the Texas Court of Criminal Appeals agreed that the special issue is redundant in this case, but observed that it is not redundant in all cases.  The Court cited, for example, a defendant convicted of capital murder for a murder committed during the commission of another felony that the defendant had conspired to commit although the defendant had no intent or actual

anticipation that a human life would be taken.  *See* <u>Valle v. State</u>,
109 S.W.3d 500, 503-04 (Tex.Crim.App. 2003) (citing Tex. Penal Code
§ 7.02(b)).   Under these circumstances, this special issue is
necessary to establish that the defendant is sufficiently morally
culpable to deserve a death sentence because the Eighth Amendment
bars the imposition of the death penalty on

> one . . . who aids and abets a felony in the
> course of which murder is committed by others
> but who does not himself kill, attempt to
> kill, or intend that killing take place or
> that lethal force will be employed."

<u>Enmund v. Florida</u>, 102 S. Ct. 3368, 3376 (1982).   The Court of
Criminal Appeals held that the fact the anti-parties issue is
redundant in the instant case does not preclude its being amenable
to review for both legal and factual sufficiency, thereby affording
meaningful appellate review of Petitioner's deathworthiness.

Petitioner fails to demonstrate that the Court of Criminal
Appeals's conclusion is incorrect, or that it constitutes an
unreasonable application of controlling law.   Therefore, he is not
entitled to relief on this claim.

### b.   <u>Victim Impact Evidence</u>

In Claim Thirteen, Petitioner makes a somewhat convoluted
argument that the mitigation special issue is unconstitutional
under the Eighth Amendment for failing to allow meaningful

appellate review because it provides "a conduit for the State to avoid the burden of proof it would otherwise bear with regards to evidence to support an affirmative finding in the future dangerousness special issue." The evident premise of the argument is that the State may offer victim impact evidence to "rebut" mitigation evidence offered by the defendant, and that the jury may then consider that rebuttal evidence without the constraints of a burden of proof in answering the future dangerousness issue, and thus, meaningful appellate review is not possible.

To the extent that Petitioner argues that the absence of a burden of proof on the mitigation special issue violates the Constitution, case law makes clear that he is mistaken. "[N]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." Rowell v. Dretke, 398 F.3d 370, 378 (5th Cir.), cert. denied, 126 S. Ct. 103 (2005). Moreover, the Supreme Court has made clear that a capital sentencing jury's discretion to give weight to mitigating evidence is unbridled and need not be reviewed by appellate courts.

> Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment. Indeed, the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.

<u>Tuilaepa v. California</u>, 114 S. Ct. 2630, 2639 (1994) (quotation marks, ellipses, and internal citations omitted).

> It is just this narrowly cabined but unbridled discretion to consider any mitigating factors submitted by the defendants and weighed as the jury sees fit that Texas has bestowed upon the jury. In so doing, Texas followed Supreme Court instructions to the letter. No court could find that Texas had acted contrary to federal law as explained by the Supreme Court . . . .

<u>Moore v. Johnson</u>, 225 F.3d 495, 506-07 (5th Cir. 2000). Accordingly, Petitioner's contention that the failure to assign a burden of proof on mitigating evidence violates the constitution is erroneous.  On direct appeal, the Court of Criminal Appeals also rejected the argument, citing its prior holding on the same claim in <u>Prystash v. State</u>, 3 S.W.3d 522, 535-36 (Tex.Crim.App. 1999) *cert. denied*, 120 S. Ct. 1840 (2000).  There is no showing by Petitioner that the Court of Criminal Appeals's conclusion is incorrect, or that it constitutes an unreasonable application of controlling law.

Petitioner does not directly argue that the admission of victim impact testimony violated his rights as such, but if that is the implication of his argument, he is mistaken there as well. Petitioner does not identify any victim impact evidence offered against him in this case, but if such evidence was of record, it would be admissible under clearly established Supreme Court

precedent.  *See* <u>Payne v. Tennessee</u>, 111 S. Ct. 2597, 2606 (1991) ("[T]he consideration of the harm caused by the crime [is] an important factor in the exercise of [sentencing] discretion" and is not barred by the Eighth Amendment.).  Victim impact testimony is a mechanism by which the sentencer is informed of the degree of harm caused by the crime.  <u>Id.</u> at 824-25.

Finally, Petitioner's argument that the admission of victim impact testimony to rebut mitigation evidence allows the admission of aggravating evidence without a burden of proof is mistaken.  The jury was instructed that the state must prove beyond a reasonable doubt each of the first two special issues, and the jury in its verdict answered that it did so find.  *See* Record on Appeal at 842, 847-48.  Thus, if the jury did consider testimony and other evidence of victim impact in answering either of the first two special issues, the jury was properly charged and constrained to return an affirmative answer only if they unanimously found "beyond a reasonable doubt" that the evidence supported such an answer.  In other words, and contrary to Petitioner's argument, the State was never permitted to avoid its burden of proof on the future dangerousness special issue, for which meaningful appellate review was available, by introducing evidence to rebut Petitioner's mitigation evidence.  Further, if the jury merely weighed the rebuttal evidence against mitigation testimony in answering the

36

mitigation special issue then, as discussed above, no burden of proof is constitutionally required.

c.   Arbitrary Infliction of the Death Penalty

In his fourteenth and final claim for relief, Petitioner contends that the entire Texas death penalty scheme is unconstitutional because an appellate court cannot review the legal or factual sufficiency of findings on any of the three special issues at the punishment phase of trial.   In support of this contention, Petitioner reiterates his arguments (1) that the anti-parties issue is redundant because the jury has already found beyond a reasonable doubt that Defendant committed capital murder, and (2) that the mitigation special issue permits jurors' individual assessments of capital murder defendants' death-worthiness.   These arguments have been considered and rejected above.   Petitioner's remaining challenge is that there is no meaningful appellate review on the jury's finding of future dangerousness because such would necessitate the Court of Criminal Appeals to substitute its own subjective judgment for the jury's judgment as to the substance and weight of evidence on that issue. In other words, Petitioner argues, "the evidence in every capital murder case will support a finding of future dangerousness under the standard for review for legal sufficiency set forth in Jackson v. Virginia." Petition at 64.

In evaluating the sufficiency of the evidence supporting a future dangerousness determination, the Texas Court of Criminal Appeals applies the standard of <u>Jackson v. Virginia</u>, 99 S. Ct. 2781 (1979).

> In reviewing the sufficiency of the evidence at punishment, this Court looks at the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have believed beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. *See* <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979) . . . .

<u>Guevara v. State</u>, 97 S.W.3d 579, 581 (Tex.Crim.App. 2003). The Court of Criminal Appeals has also listed a number of non-exclusive factors appropriate for consideration in reviewing the sufficiency of the evidence to support a finding of future dangerousness:

> 1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
>
> 2. the calculated nature of the defendant's acts;
>
> 3. the forethought and deliberateness exhibited by the crime's execution;
>
> 4. the existence of a prior criminal record, and the severity of the prior crimes;
>
> 5. the defendant's age and personal circum-stances at the time of the offense;
>
> 6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

38

       7. psychiatric evidence; and

       8. character evidence.

<u>Keeton v. State</u>, 724 S.W.2d 58, 61 (Tex.Crim.App. 1987).  Petitioner's blanket assertion that future dangerousness cannot be reviewed in an objective manner does not withstand scrutiny under these authorities that articulate clear and rational factors that a jury may consider and that may be reviewed on appeal.  On direct appeal the Court of Criminal Appeals acknowledged that while the circumstances of a particular offense can be sufficient to sustain an affirmative finding of a defendant's future dangerousness, that holding does *not* mean that the circumstances of *every* offense will *always* support such a finding.  <u>Valle</u>, 109 S.W.3d at 503.  Indeed, the Court observed, "there are situations in which the circumstances of the offense alone would not support a finding of future dangerousness," <u>id.</u>, and hence, because meaningful appellate review is available, Petitioner's constitutional challenge was rejected.

     Several of the <u>Keeton</u> factors would assist meaningful appellate review in this case.  The evidence established that: Petitioner planned and carried out the robbery and murder; he directed several accomplices to carry out his plan; the crime required considerable forethought and deliberateness; and Petitioner had a significant prior criminal record.  There was no evidence that Petitioner's age was an influential factor, and he

did not act under duress or the domination of another (on the contrary, the evidence established that Petitioner was the ringleader).  Finally, the jury heard both character evidence and expert psychological testimony.  Under these circumstances, the Court of Criminal Appeals was able to review the sufficiency of the evidence as it has in other cases.  *See*, *e.g.*, <u>Roney v. State</u>, 632 S.W.2d 598 (Tex.Crim.App. 1982); <u>Garcia v. State</u>, 626 S.W.2d 46 (Tex.Crim.App. 1982)(both striking down death sentences where the finding of future dangerousness was not supported by any evidence other than the fact of the underlying crime).

The first two special issues both are susceptible to meaningful appellate review before the death penalty can be imposed.  The third special issue, in accordance with Supreme Court precedent, allows for "unbridled discretion to consider any mitigating factors submitted by the defendants and weighed as the jury sees fit."  <u>Moore</u>, 225 F.3d at 506-07.  Petitioner has not shown that the Court of Criminal Appeals, in holding that the Texas death penalty scheme is not unconstitutional, either ruled incorrectly or unreasonably applied governing law.

## III.   <u>Certificate of Appealability</u>

Petitioner has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  *See* <u>Alexander v.</u>

_Johnson_, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA _sua sponte_.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.")  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  _See_ _Whitehead v. Johnson_, 157 F.3d 384, 388 (5th Cir. 1988); _see also_ _Hill v. Johnson_, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." _Lackey v. Johnson_, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); _see also_ _United States v. Kimler_, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." _Hernandez v. Johnson_,

213 F.3d 243, 248 (5th Cir.), *cert. denied*, 121 S. Ct. 400 (2000).

The Supreme Court has stated that:

> Where a district court has rejected the
> constitutional claims on the merits, the
> showing required to satisfy § 2253(c) is
> straightforward: The petitioner must demon-
> strate that reasonable jurists would find the
> district court's assessment of the constitu-
> tional claims debatable or wrong.

Slack v. McDaniel, 120 S. Ct. 1595, 1604 (2000). "The nature of
the penalty in a capital case is a 'proper consideration in
determining whether to issue a [COA], but the severity of the
penalty does not in itself suffice to warrant the automatic issuing
of a certificate.'" Washington v. Johnson, 90 F.3d 945, 949 (5th
Cir. 1996), *cert. denied*, 117 S. Ct. 1259 (1997) (*quoting* Barefoot
v. Estelle, 103 S. Ct. 3383, 3394-95 (1983)). However, "the
determination of whether a COA should issue must be made by viewing
the petitioner's arguments through the lens of the deferential
scheme laid out in 28 U.S.C. § 2254(d)." Barrientes v. Johnson,
221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 121 S. Ct. 902
(2001).

This Court has carefully and exhaustively considered each of
Petitioner's claims.  While the issues Petitioner raises are
clearly important and deserving of the closest scrutiny, the Court
finds that each of the claims is foreclosed by clear, binding
precedent.  This Court concludes that under such precedents,

Petitioner has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Court concludes that Petitioner is not entitled to a certificate of appealability on his claims.

IV.  <u>Order</u>

For the foregoing reasons, it is ORDERED as follows:

1.    Respondent Nathaniel Quarterman's Motion for Summary Judgment (Document No. 11) is GRANTED;

2.    Petitioner Yosvannis Valle's Petition for Writ of Habeas Corpus (Document No. 1) is in all respects DENIED, and Valle's Petition is DISMISSED WITH PREJUDICE;

3.    No Certificate of Appealability shall issue.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 13th day of February, 2008.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE